UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Denise Laflamme and the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities,<br>          *Plaintiffs*,<br><br>          *v.*<br><br>New Horizons, Inc. and Michael Shaw,<br>          *Defendants*. | Civil No. 3:06cv1809 (JBA)<br><br><br><br><br><br>March 31, 2009 |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT,
## MOTION TO COMPEL COMPLIANCE, AND MOTION TO DISMISS

This case presents issues that go to the heart of what the Fair Housing Act means for persons with disabilities. On one side is New Horizons, Inc. ("New Horizons"), the owner of a state-supported facility, New Horizons Village ("NHV"), which offers rental housing for people who are severely physically disabled yet still capable of living independently. On the other side is Denise Laflamme, a woman with severe physical disabilities who returned from a hospital stay to find that her apartment at NHV was no longer available. Together with the State of Connecticut Office of Protection and Advocacy for Persons with Disabilities ("OPA"), Laflamme brought this case against New Horizons and its executive director, Michael Shaw, alleging that New Horizons's housing practices are discriminatory and unlawful under the Fair Housing Act.

The Defendants' position is that, owing to their mission to serve people with severe yet manageable physical disabilities, they must be allowed to draw distinctions based on the extent of their tenants' disabilities in order to serve the interests of all their residents by ensuring the viability of the facility. Plaintiffs Laflamme and OPA counter that this practice, however well-intentioned, is nevertheless disability discrimination in violation of the Fair

Housing Act.  They bring suit pursuant to section 804 of the Fair Housing Act, 42 U.S.C. § 3604, as amended by section 6(a) of the Fair Housing Amendments Act of 1988, Pub. L. 100-430, 102 Stat. 1620 (together, the "FHA").  Now before the Court are several motions: (1) the parties' cross-motions for summary judgment on the issue of whether Defendants discriminated against Laflamme on the basis of her disability; (2) OPA's motion to compel compliance with this Court's previous ruling granting in part a preliminary injunction; and (3) Defendants' motion to dismiss OPA for lack of standing.

As explained in more detail below, the Court holds that New Horizons's housing practices are unlawful.  The Fair Housing Act prohibits landlords from discriminating in the terms and conditions of rental housing on the basis of disability.  The Defendants' longstanding commitment to serving the physically disabled notwithstanding, their policy of leasing apartments at NHV only after inquiring into prospective tenants' medical and personal histories, and then assessing whether applicants are able to live independently based on the nature and characteristics of their individual disabilities, constitutes exactly the discrimination that the FHA forbids.  To conclude otherwise would amount to grafting an additional exception onto the statute that is simply not there, and NHV has provided no basis on which otherwise to exempt it from the FHA obligations applicable to private landlords.  Thus, because the undisputed evidence shows that the Defendants applied unlawful policies to Denise Laflamme, the Court grants Laflamme's motion for summary judgment and denies the Defendants' motion for summary judgment.  The Court further finds that OPA has properly met the prerequisites for exercising organizational standing, and so the Court denies Defendants' motion to dismiss and grants OPA's motion to compel compliance.

2

I.      **Background**

Although some aspects of the record are disputed, the essential facts necessary to decide the pending motions are uncontested and are as follows.

A.      **History and Features of New Horizons Village**

New Horizons traces its history to 1955, when a group of men and women at New Britain Memorial Hospital began an organized effort to establish alternative, non-institutional housing opportunities for severely physically disabled people like themselves who nevertheless have the ability and desire to live on their own.  The Connecticut General Assembly eventually passed enabling legislation which authorized New Horizons "to construct and operate an independent living facility for severely physically disabled adults, in the town of Farmington."  Conn. Gen. Stat. § 19a-507.  Construction of New Horizons Village ("NHV") was completed in 1986, and the complex now has sixty-eight fully accessible units able to house 101 tenants.  Consistent with New Horizons's mission, NHV offers one- and two-bedroom apartments for severely physically disabled adults who, with limited assistance, "are able to live independently."  (Shaw Aff., Feb. 23, 2007, Pl.'s Ex. 1 to Mem. Supp. [Doc. # 83-2], ¶ 4.[1])  New Horizons management is also directed by the disabled community it serves: disabled persons and former NHV residents comprise over half the board of directors.

NHV is neither a nursing home nor a medical facility.  Rather, through an arrangement with the State of Connecticut, NHV receives funding from the Department of Social Services ("DSS") which is provided to qualifying tenants in order to pay rent and the

_____

[1] Except as elsewhere noted, record citations refer to materials submitted in connection with Laflamme's motion for summary judgment which are undisputed.

3

cost of employing Personal Care Attendants ("PCAs").  PCAs, who are not medical professionals, spend up to six hours a day with each resident and typically help with things like meal preparation, chores, and personal care.  NHV offers wheelchair-lift-equipped transportation around the local community, and also employs Village Care Attendants and registered nurses to provide extra assistance.  Importantly, NHV staff does not provide medical care or supervision to tenants; the nurses "work normal business hours serving as a resource to tenants" and provide liaison services regarding healthcare options available in the local area.  (NHV Tenant Handbook, Pl.'s Ex. 21, at 4.)

### B.   NHV Application Process

The application process for tenancy at NHV is rigorous.  A prospective tenant must submit a form which seeks general information as well as details about the applicant's disability.  The tenant-selection committee, which is made up of NHV tenants and staff, then requires the applicant to authorize disclosure of comprehensive medical records and background information.  The committee reviews these records once received and determines whether to offer the applicant an interview based on "general compatibility with the tenant selection criteria."  (Defs.' Resp., Pl.'s Ex. 4, at 5.)  Candidates that reach this stage are asked to appear before the committee for an interview and then to have members of the committee over for a home visit.  During a home visit, an applicant might be asked to talk about his or her care needs and to demonstrate transferring to and from a wheelchair.  Following a home visit, the committee reconvenes and makes a final decision based on the applicant's personal-care requirements, financial eligibility, and suitability for the environment at NHV.  Prospective tenants who successfully complete the application process must then wait for an opening in one of the shared apartments.

The committee's evaluation of an applicant is guided by the terms of NHV's "Tenant Selection Criteria," which are stated, in relevant part, as follows:

> New Horizons Village is designed to serve adults who have limited mobility due to severe physical disabilities.  To be considered for residency, an individual must meet all of the following general criteria:
>
> - A severe physical or neurological disability
>
> - At least 18 years of age
>
> - The ability and willingness to live without supervision.  Tenants of New Horizons Village assume responsibility for their own finances, lease agreements, daily personal care and apartment upkeep
>
> - Emotional stability with no manifestation of psychotic or pathological behavior including substance abuse
>
> - Control of bodily functions through natural or adaptive means
>
> - Medical care needs which can ordinarily be accommodated through outpatient community resources
>
> - An ability to meet the cost of New Horizons Village either through state and federal benefit programs or private resources.

(Tenant Selection Criteria, Pl.'s Ex. 23.)  The standard NHV lease, in addition to including many typical conditions of apartment tenancy, also restates the overriding requirement that the complex is designed for individuals capable of living independently:

> 20.   INDEPENDENT LIVING.  New Horizons is not licensed or operated to provide medical care or supervision.  As a tenant at New Horizons Village, you must be able to live independently.  The tenant selection process therefore includes an assessment of the medical and healthcare needs of each applicant, and you have been required to provide New Horizons Village with all medical records and information which are deemed by New Horizons Village to be necessary for such an assessment.  If it becomes apparent that you have withheld pertinent information or supplied incomplete, inaccurate or misleading information relative to the selection criteria

for your suitability for residency, we may terminate this lease and evict you.  In the event of a change in your medical condition which would affect your ability to live independently, you agree to provide us with such information regarding the change in your medical condition within ten (10) days of said change.  In the event that you fail to provide us with such information within said ten (10) day period, or in the event that your medical condition changes to the extent that you would no longer qualify to live at New Horizons Village, then in either of such events, we have the option to terminate this lease and we may evict you from the premises.

(NHV Lease, Pl.'s Ex. 15, at 8.)  The NHV Tenant Handbook contains a similar provision. (Tenant Handbook, Pl.'s Ex. 21, at 7.)

The summary-judgment record includes examples of how these policies and procedures work in practice.  At a meeting on April 22, 2004, the tenant-selection committee discussed the records of "MY," a man with severe medical problems associated with being paralyzed after being shot five years earlier.  (Meeting Minutes, Pl.'s Ex. 14.)  The committee "noted that [he] has had multiple hospitalizations and has amassed a prolific amount of medical records as was noted by medical providers asked to submit records" and thus denied MY an interview after finding his "medical status and care needs" to be "well beyond the limits of New Horizons."  In September 2004, the committee reviewed the records of "G," a NHV applicant with cerebral palsy, diabetes, and other conditions.  (Meeting Minutes, Ex. 2 to Miller Aff., Defs.' Ex. A to Defs.' Opp'n [Doc. # 104].)  The committee interviewed G and scored him "very high" on the grounds that he "knows his care needs and is capable of managing and directing his own care."  After visiting G at home, the committee put his application on hold in January 2005, citing his "medical issues regarding groin pain and his diabetes," noting also the need for further updates on his progress.  By the end of that month, the committee was satisfied with his medical status and approved G for residency,

6

conditioned on G agreeing "in writing that he understands a sliding scale insulin regime cannot be accommodated at NHV."

According to the minutes for April 14, 2005, the committee reviewed the medical records of "GM," a mildly mentally retarded man with congenital blindness, arthritis, and psychiatric conditions, and concluded that he would not be granted an interview "as he needs supervision." (Meeting Minutes, Ex. 1 to Pl.'s Reply [Doc. # 106].) During the same meeting, the committee declined to interview "JL," a man with progressive multiple sclerosis and additional psychiatric and neurological problems, on the ground that "he would do best in an environment with some supervision to help with daily decision making." At a later meeting in August 2005, the committee denied "JD" an interview because "he needs supervision" to manage his "behavioral and cognitive issues." By contrast, after reciting the medical status of "ML," the committee found that he was able to manage his paraplegic condition, despite a history of depression, suicidal ideation, and substance abuse, in part because "[h]e had gone through a program and straightened himself out." The committee also recounted a successful home visit with "TC," a younger applicant, during which he "demonstrated a stand pivot transfer" and impressed the committee members by being "very motivated to live on his own and very pleasant." The committee noted the need for further background checks on TC.

### C.      Denise Laflamme

Denise Laflamme is now forty-two years old. She has cerebral palsy, experiences seizures, suffers from other physical disabilities, uses a wheelchair for mobility, and is diagnosed with depression. In February 2004, then living in a non-accessible private apartment in New Haven, Laflamme applied to NHV according to the usual process

described above. She filled out the application form and executed the authorizations for release of her medical records and background information. The tenant-selection committee then reviewed her medical records at a meeting in April 2004, finding sufficient grounds to interview her despite her seizures and depression. When they interviewed her later that month, the committee members recognized Laflamme's desire for independence and "long[ing] for the social community of NHV." (Meeting Minutes, Pl.'s Ex. 9.) Having impressed the committee during her interview and home visit, Laflamme was approved for tenancy in May 2004 with a PCA allotment of about twelve and a half hours per week, "contingent on [her] satisfactory medical and financial condition at the time of an opening." (May 24, 2004 Letter, Pl.'s Ex. 16.) A shared unit became available a few months later, and, after signing the standard lease, Laflamme moved into NHV in August 2004.

Laflamme's stay at NHV did not last long, however. Over the next few months, her mental health worsened, she called for an ambulance seeking emergency treatment at least eight times, and she was hospitalized at least twice. NHV staff expressed concern that Laflamme was not effectively managing her own care, and PCAs reported problems working with her. On November 11, 2004, Laflamme was admitted to the Institute of Living ("IOL"), a mental-health facility at Hartford Hospital, and treated for depression and suicidal ideation. She was discharged on November 18, with the treating psychiatrist recommending that Laflamme return to NHV and continue to take her medication and receive out-patient services at the University of Connecticut Medical Center in Farmington.

The parties characterize what happened next in different ways. Carolyn Fields, the manager at NHV, reviewed Laflamme's discharge plan and was very concerned:

31.    If Ms. Laflamme returned, she would be living with [her roommate]

8

(also severely disabled) in an apartment without supervision and without personal care assistance for more than 18 hours per day.

32. Ms. Laflamme had no program in place to prevent relapse. . . .

33. I concluded that Ms. Laflamme was unable while at New Horizons to effectively manage her own health care needs, and New Horizons was not established for the purpose of satisfying those needs.  What Denise needed is antithetical to what residents like [her roommate] want from New Horizons.

34. On November 18, 2004, Ms. Laflamme was discharged from the Institute of Living.  After determining that Ms. Laflamme was incapable of managing and directing her care, and that adequate care was unavailable, I called Denise Laflamme's mother.  I told Carol Laflamme that Denise could not return to New Horizons and explained my reasons.  I did not talk to Denise Laflamme.

(Fields Aff., Ex. B to Defs.' Mem. Supp. [Doc. # 86], ¶¶ 31–34.)  Committee member Sharon Miller confirmed in her deposition testimony that Carol Laflamme came to a NHV meeting on November 17, 2004, indicating that her daughter wanted to return to her apartment at NHV, but also expressing caution that Denise was a "bit fearful."  (Miller Dep., Pl.'s Ex. 3, at 211:8–25.)  Carol Laflamme recounts that she was in contact with Fields, Shaw, and other NHV staff repeatedly following Denise's hospitalization on November 11:

4. On November 19, 2004, NHV manager Carolyn Fields called me and told me that Denise was not to return to New Horizons.  Denise and I asked that she review Denise's situation and reconsider.  Ms. Fields stated that I could contact her on November 29, but that in the meantime, Denise could not return.

5. On November 29, 2004, I received a call from Ms. Fields stating that Denise could not return.  I asked whether I could appeal the decision and she directed me to Michael Shaw.

6. I called Mr. Shaw.  He stated that Denise would not be allowed to return to NHV and stated that a letter would follow.  He also told me to remove Denise's belongings immediately.  I felt threatened by Mr.

9

Shaw's statements.

7.      I received a letter dated December 2, 2004 shortly thereafter stating
        that Mr. Shaw had decided that Denise could not return to NHV.

(Carol Laflamme Aff., Pl.'s Ex. 19, ¶¶ 4–7.)  Sometime on or before December 15, Carol

Laflamme came to Denise's apartment at NHV to remove her belongings.

        In his letter to Carol Laflamme dated December 2, 2004, Shaw wrote that he was

"summariz[ing] the decision regarding Denise's residency at New Horizons Village."  After

listing the tenancy requirements associated with the overriding principle of independent

living at NHV, Shaw confirmed: "It has become apparent that Denise does not meet these

criteria.  It is in the best interest of Denise that she gets into an environment where her social

and emotional needs can be me[t]."  (Dec. 2, 2004 Letter, Pl.'s Ex. 22.)  Shaw reemphasized

NHV's independent-living requirement and, after offering concern for Laflamme's well-

being, invited her to reapply in the future.  But elsewhere, Shaw and Fields hedge when

describing what exactly transpired after November 18, 2004.  Fields avers: "Ms. Laflamme

was never served with any eviction notice or notice to quit.  She was not barred or prevented

from entering the apartment she shared with [her roommate]."  (Fields Aff., Defs.' Ex. B,

¶ 37.)  Similarly, Shaw claims that "Ms. Laflamme was neither evicted nor constructively

evicted from her apartment," but rather "[i]t was strongly recommended that she pursue an

alternative living arrangement in her own best interest," and so "Laflamme moved out of her

own volition."  (Shaw Aff., Pl.'s Ex. 1, ¶¶ 34, 36.)  During his deposition, Shaw was reluctant

to confirm that Laflamme was affirmatively precluded from returning to NHV,

characterizing it instead as something of a mutual decision made according to Laflamme's

best interests.  Nevertheless, Shaw admitted, based on Laflamme's medical condition, NHV's

10

"preference" was for Laflamme not to return, and so he upheld Fields's determination upon appeal by Carol Laflamme.   (Shaw Dep., April 8, 2008, Pl.'s Ex. 20, at 12:24–13:20, 20:21–21:8, 53:15–22.)

### D.    Procedural History

On June 13, 2005, Laflamme filed a complaint with the state Commission on Human Rights and Opportunities, which was cross-filed with the Department of Housing and Urban Development ("HUD"), charging New Horizons with violating the FHA.  In the course of agency proceedings, New Horizons, through its chief financial officer, justified its actions essentially as follows:

> For New Horizons to discriminate against an individual based on her physical disability would be inherently contradictory to its reason for existence.

> However, not every physically disabled person can be a resident of New Horizons.  To be physically disabled is a necessary but not sufficient condition to live at New Horizons.  The other necessary condition is that the person be able to and demonstrate the ability to live independently at New Horizons.  This ability requires social and psychological competence to do so.

> The State of Connecticut's financial support of New Horizons Village is based on the premise that its residents live independently and operate their own affairs.  New Horizons operates in accordance with that mission.

(Oct. 12, 2005 CHRO Letter, Pl.'s Ex. 2, at 2–3.)  HUD closed Laflamme's complaint on January 26, 2006.

Together with OPA, Laflamme initiated this action on November 9, 2006, alleging that New Horizons violated the FHA in several ways: by imposing the independent-living requirement, compelling an overbroad disclosure of medical records and background information, challenging and making discriminatory statements about Laflamme's ability

to live independently, and preventing her from returning to her apartment after being discharged from IOL. Laflamme seeks damages, while OPA—whose claims are not directly implicated by the motions for summary judgment—seeks declaratory and injunctive relief.

At an earlier stage in this case, OPA sought to preliminarily enjoin the Defendants from enforcing the independent-living and medical-record requirements at NHV. *Laflamme v. New Horizons, Inc.*, 514 F. Supp. 2d 250, 252 (D. Conn. 2007). On a more limited record, the Court concluded that OPA had demonstrated "neither irreparable injury nor a clear showing of likely success on the merits" on its claim that the independent-living requirement has a disparate impact on severely disabled applicants to NHV. *Id.* at 256. But the Court further concluded that the medical-records releases "go too far" in that they require disclosure of information beyond which is necessary to determine eligibility for tenancy. *Id.* at 257. Thus, the Court enjoined New Horizons from using the releases as then written, and directed the Defendants to file revised application forms for review. *Id.*

## II.    Legal Framework of the FHA

As amended in 1988, the FHA makes it unlawful "[t]o discriminate in the sale or rental [of] a dwelling," "to otherwise make [a dwelling] unavailable," or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" on the basis of handicap or disability.[2]  42 U.S.C. § 3604(f)(1)–(2); *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 150 (2d Cir. 1999). Such unlawful "discrimination includes

---

[2] The term "handicap" as used in the FHA has the same legal meaning as the now more generally accepted term "disability." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). The Court will use the latter.

. . . a refusal to make reasonable accommodations" when "necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).  The FHA defines a "handicap" as "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).  But these protections do not extend to drug addicts or "individual[s] whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in the substantial physical damage to the property of others." 42 U.S.C. §§ 3602(h), 3604(f)(9).

The extension of FHA protections to individuals with disabilities in the 1988 amendments was a recognition of the principle that a person's disability, no less than his or her race or sex, is an impermissible reason to deny equal access to housing opportunities. *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir. 1995).  The relevant legislative history (which the Second Circuit cited in *Shapiro*) indicates that the amendments represented

> a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream.  It repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals.  Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.

H.R. Rep. No. 100-711, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179.  Among other things, the amended FHA was intended to prohibit "the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities," which "often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears

13

of difficulties about the problems that their tenancies may pose." *Id.* at 24 (footnote omitted).

Regulations promulgated by HUD elaborate on the limited nature of the inquiry housing providers can make of disabled prospective tenants; the regulations generally prohibit questions regarding whether an applicant "has a handicap or . . . as to the nature and severity of a handicap of such a person." 24 C.F.R. § 100.202(c). A landlord may inquire, however, whether an applicant is able "to meet the requirements of ownership or tenancy" and "whether an applicant is qualified for a dwelling available only to persons with handicaps or to persons with a particular type of handicap." 24 C.F.R. § 100.202(c)(1)–(2). In the final rulemaking process, HUD explained this latter exception as follows:

> [S]ome Federal and State housing is designed for, and occupied by, persons with handicaps. Only persons with handicaps are eligible to live in such dwellings. Beyond this, as the Department explained in the proposed rule, the Fair Housing Amendments Act does not prohibit the exclusion of non-handicapped persons from dwellings. A privately owned unsubsidized housing facility may lawfully restrict occupancy to persons with handicaps. The owner or operator of such a housing facility must therefore be permitted to inquire of applicants to determine whether they have a handicap for the purpose of determining eligibility.
>
> A housing provider may also choose to offer some or all of its units to persons with handicaps on a priority basis and may inquire whether applicants qualify for such a priority. For example, a housing provider may offer accessible units to persons with mobility impairments on a priority basis and may ask applicants whether they have a mobility impairment which would qualify them for such a priority but may not in such circumstances ask applicants whether they have other types of impairments.

Implementation of the Fair Housing Amendments Act, 54 Fed. Reg. 3232, 3246 (Jan. 23, 1989) (codified at 24 C.F.R. pt. 100). But even though the HUD regulations permit a limited inquiry into whether an applicant has a qualifying disability, they maintain the FHA's flat

prohibition on denying housing or discriminating in the terms of offering housing because of an applicant's disability.  24 C.F.R. § 100.202(a)–(b) (mirroring the prohibitions in 42 U.S.C. § 3604(f)(1)–(2)).  Examples of such unlawful actions include:

> (1) Failing to accept or consider a bona fide offer because of . . . handicap[;]
>
> (2) Refusing to sell or rent a dwelling to, or to negotiate for the sale or rental of a dwelling with, any person because of . . . handicap[;]
>
> (3) Imposing different sales prices or rental charges for the sale or rental of a dwelling upon any person because of . . . handicap[;]
>
> (4) Using different qualification criteria or applications, or sale or rental standards or procedures, such as income standards, application requirements, application fees, credit analysis or sale or rental approval procedures or other requirements, because of . . . handicap[; and]
>
> (5) Evicting tenants because of their . . . handicap[.]

24 C.F.R. § 100.60(b).  The FHA further prohibits making statements and publishing notices or advertisements that indicate a "preference, limitation, or discrimination" based on disability.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75.  Reading this provision broadly, the Second Circuit notes that it "protects against the psychic injury caused by discriminatory statements made in connection with the housing market."  *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (quotation marks omitted).

HUD regulations also reaffirm the "direct threat" exception codified in § 3604(f)(9), noting that "[n]othing in this subpart requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."  24 C.F.R. § 100.202(d).  But as the House Report emphasized, this exception was to be a narrow one:

Any claim that an individual's tenancy poses a direct threat and a substantial risk of harm must be established on the basis of a history of overt acts or current conduct. Generalized assumption, subjective fears, and speculation are insufficient to prove the requisite direct threat to others. . . . The landlord may ask the applicant for references to determine the applicant's eligibility for tenancy, as he does for other applicants. If the landlord determines, by objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health or safety of others, the landlord may reject the applicant as a tenant. In assessing information, the landlord may not infer that a recent history of a physical or mental illness or disability, or treatment for such illnesses or disabilities, constitutes proof that an applicant will be unable to fulfill his or her tenancy obligations. . . .

Thus, in assessing an application for tenancy, a landlord or owner may ask an individual the questions that he or she asks of all other applicants that relate directly to the tenancy (e.g., questions relating to rental history or a targeted inquiry as to whether the individual has engaged in acts that would pose a direct threat to the health or safety of other tenants), but may not ask blanket questions with regard to whether the individual has a disability. Nor may the landlord or owner ask the applicant or tenant questions which would require the applicant or tenant to waive his right to confidentiality concerning his medical condition or history.

H.R. Rep. No. 100-711, at 29–30.

The FHA further provides that victims of discriminatory housing practices may sue and seek both damages and equitable relief. 42 U.S.C. § 3613(a), (c).

## III.    Motions for Summary Judgment

Laflamme and the Defendants have moved for summary judgment based on their totally divergent views of what the FHA means. Laflamme contends that she has established direct evidence of discrimination through the uncontested evidence that New Horizons made her home at NHV unavailable because of her disability. Defendants argue that they are entitled to summary judgment because their housing policies and their actions toward Laflamme are consistent with the FHA as a matter of law. These motions raise essentially

16

the same issues—indeed, the parties repeat arguments in both their supporting and opposition briefs.  Therefore, for the purpose of efficiency, the Court will evaluate the grounds for summary judgment together where appropriate.  Mindful of the parties' respective burdens given their alternating positions as movants and non-movants, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993), the Court will nevertheless assess each motion according to the usual Rule 56 standard, pursuant to which a party is entitled to summary judgment if the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

**A.    Statute of Limitations**

As a threshold matter, the Defendants argue that Laflamme's challenge to the medical-records requirement for tenancy at NHV is barred by the applicable two-year statute of limitations in the FHA.  *See* 42 U.S.C. § 3613(a)(1)(A).  Because the disclosure of medical records was relevant only to the tenant-selection committee's review of Laflamme's application materials, Defendants contend, her claim arose by no later than May 24, 2004, which is more than two years prior to the date Plaintiffs' complaint was filed.  Defendants maintain that the agency proceedings are irrelevant on this point because Laflamme's administrative complaint did not specifically implicate the medical-records requirement.

This defense fails on two grounds.  First, the FHA provides in 42 U.S.C. § 3613(a)(1)(B) that the two-year limitations period "shall not include any time during which an administrative proceeding under this subchapter was pending with respect to a complaint or charge under this subchapter based upon such discriminatory housing practice."  It is undisputed that Laflamme's administrative complaint was pending before

17

HUD for about seven months, and there is no question that Laflamme's complaint alleged that NHV's housing practices—including the requirement pertaining to medical releases (*see* CHRO Letter, Pl.'s Ex. 2)—violate the FHA.  Thus excluding these seven months from the two-year statutory period, her claim, using the May 24 date suggested by Defendants, is timely.  *Boykin v. Keycorp*, 521 F.3d 202, 212 (2d Cir. 2008).

Second, it is disingenuous to assert, based on this record, that NHV required medical disclosures only up to the point at which the committee approved Laflamme's application.  The letter dated May 24, 2004 indicated that Laflamme's acceptance was "contingent on [her] satisfactory medical and financial condition at the time of an opening," and Laflamme's lease confirmed her continuing obligation to update New Horizons on her medical condition.  NHV staff assessed Laflamme's status when she was discharged from IOL on November 18, 2004, and it was on the basis of her discharge paperwork that the Defendants found Laflamme no longer suitable for NHV's independent-living environment.  Even disregarding the statutory tolling of the limitations period, Defendants relied on Laflamme's medical disclosures within the two years prior to the filing of the complaint on November 9, 2006.  Laflamme's claim directed at the medical-records requirement is timely.

### B.    New Horizons's Housing Policies

Turning to the merits of Laflamme's claims, she  challenges the manner in which the Defendants applied NHV's independent-living requirement to her, from her application process through the end of her tenancy.

All parties agree that the FHA applies to NHV.  There is no question that New Horizons considers physically disabled applicants eligible to live at NHV only if they are able

to live independently.[3]   New Horizons's policies implementing this fundamental requirement—involving disclosure of comprehensive medical records, careful screening, and ongoing monitoring—are undisputed and amply described in the record.   By following the stated tenant-selection criteria, Defendants indisputably draw distinctions based on the disabilities of applicants.   Such undisputed circumstances permit but one conclusion: Laflamme has established direct evidence that New Horizons discriminated against her on the basis of her disability in disallowing her continued tenancy at NHV.

### 1.   Independent-Living Requirement

First, Defendants' application of NHV's independent-living requirement to Laflamme violated 42 U.S.C. § 3604(f).   By making a housing determination based on whether the nature and characteristics of Laflamme's disabilities—specifically, her depression and suicidal ideation—precluded her from meeting the NHV standard of independent living, Defendants denied her equal housing opportunity on the basis of disability.

Promoting the opportunity for disabled persons to live independently was in fact a central feature of the FHA amendments: "The right to be free from housing discrimination is essential to the goal of independent living." H.R. Rep. No. 100-711, at 18.  But in practice,

---

[3] Defendants' Local Rule 56(a)2 Statement in opposition to summary judgment is oddly evasive on this point.  Responding to Laflamme's assertion that New Horizons "has an independent living requirement," Defendants state that they "cannot respond without a definition of 'independent living,'" before then admitting that "a requirement of tenancy at [NHV] is 'independent living,' in the sense of a willingness and ability to manage one's own affairs and care given the services and program."  (Defs.' Loc. R. 56(a)2 Stmt. at 5.)  To the extent that the parties in fact disagree over what "independent living" means for the purposes of this case, such dispute is not a material one.  The Court will adopt the Defendants' conception of "independent living," however variously defined in the record.

the few cases to take up the issue have been confronted with the notion of "independent living" being used as an impediment to, rather than a benefit of, equal housing opportunities.  In *Cason v. Rochester Housing Authority*, 748 F. Supp. 1002, 1004 (W.D.N.Y. 1990), disabled applicants for low-income public housing challenged under the FHA a requirement imposed by the housing authority that residents must have the "ability to live independently."   The district court held that this eligibility standard was unlawfully discriminatory because the authority rejected only disabled applicants on this basis, and the court also found that the inquiries made into applicants' ability to live independently violated the provisions of 24 C.F.R. § 100.202(c).  *Id.* at 1007–09.  Building on this reasoning, another court held that a housing provider receiving targeted federal funds—pursuant to § 811 of the Cranston-Gonzalez National Affordable Housing Act and § 202 of the National Housing Act—unlawfully used an independent-living requirement as a justification for excluding prospective tenants on the basis their disabilities:

> The exclusion of [plaintiff] and other people with mobility disabilities who have been deemed by [the housing provider defendant] to be incapable of independent living can be viewed at best as a paternalistic attempt to direct these individuals to more suitable housing and at worst, as prejudicial discrimination.  Either way, the exclusion of those who do in fact suffer from a mobility disability but who are not able to live independently is violative of the [FHA] and is not condoned by § 811.  As such, "independent living" is not a proper admissions criteria for § 811 housing.

*Jainniney v. Maximum Indep. Living*, No. 00-879, slip op. at 15–16 (N.D. Ohio Feb. 1, 2001).

Consistent with these cases and the plain text of the FHA, the generalized goal of independent living for disabled individuals does not permit Defendants to use that otherwise laudable end to deny equal housing opportunity to individuals because of their disabilities.  Defendants concede that they evaluate the severity of applicants' physical and mental

disabilities as relevant to determining suitability for independent living at NHV, and, as highlighted above, the record features numerous examples of how this disability-based determination works in practice. To use Defendants' terminology, their practice of applying the independent-living requirement to Laflamme involved making an "individualized determination" of the impact of her disabilities. (*E.g.*, Shaw Aff., Pl.'s Ex. 1, ¶ 24.) When Defendants assessed Laflamme in this manner—and demanded her continued compliance with the requirement as a condition of tenancy—based on her disability, they violated her rights under the FHA.

### 2.    *Medical-Records Requirement*

Second, by inquiring into the nature and extent of Laflamme's physical and mental disabilities beyond a threshold determination of whether she qualified as severely physically disabled, Defendants engaged in the prohibited activity described in 24 C.F.R. §§ 100.60 and 100.202.

Following the lead of *Cason*, other courts recognize how application of an independent-living requirement can lead to inquiries prohibited by the FHA. In *Niederhauser v. Independence Square Housing Corp.*, No. 96-20504, 4 Hous.–Fair Lending (Aspen L. & Bus.) ¶ 16,305 at 16,305.5 (N.D. Cal. 1998), the district court determined that the FHA requires a landlord to "use the least invasive means necessary to verify an applicant's qualifications" for federally subsidized housing. The court cautioned that such an inquiry is limited to the terms of the federal subsidy—in that case, providing housing to elderly or physically disabled persons—and that going beyond those eligibility criteria to ask whether an applicant "can live independently" is unlawful. *Id.* The Maine high court similarly recognized the limits imposed by HUD regulations in *Robards v. Cotton Mill*

*Associates*, holding that a housing provider's requirement that a physician describe an applicant's medical condition is not necessary to determine eligibility and "exceeded the scope of the permissible inquiry allowed by section 100.202(c)(2)." 713 A.2d 952, 954 (Me. 1998).

Here, the Court has already ruled, in granting injunctive relief, that NHV's medical-records practices in place throughout Laflamme's tenancy were overly broad:

> The Court agrees that defendants' "Release of Background Information Form" and "Release of Medical Information Form" are too broad as currently written to come under the narrow exceptions to § 100.202(c). [New Horizons] would be permitted under the HUD regulations to require the disclosure of records which would (a) verify the nature of an applicant's severe physical disability and therefore his or her eligibility, and (b) substantiate whether the applicant "would constitute a direct threat to the health or safety of other[s]" at NHV. *See* § 100.202(c)(2), (d). But [the] forms go too far in mandating that applicants "authorize full disclosure of any and all [background information] records" and "authorize the release of [medical] information [concerning] any past or present diagnoses, any surgical operation reports, any psychological and psychiatric reports, current health status summaries and medical charts, and a current history and physical examination."

514 F. Supp. 2d at 257. Defendants required these comprehensive medical disclosures as a condition of admission and continued tenancy for Laflamme and all other prospective tenants. There is no question that inquiries by NHV staff went beyond mere baseline eligibility for housing, because Defendants admit that they needed such detail in order to assess whether applicants met NHV's criteria for independent living. Rather than seeking medical records only for the limited purposes authorized by the FHA and associated regulations, Defendants' inquiries as to Laflamme exceeded the limits imposed by law. This, too, was a discriminatory housing practice in violation of the FHA.

3.     *Denying Laflamme Housing*

Finally, Defendants violated the FHA by denying Laflamme access to her apartment after she was discharged from IOL.  Whether characterized as making her dwelling unavailable because of her disability, 42 U.S.C. § 3604(f)(1), or by refusing to reasonably accommodate Laflamme upon her return, § 3604(f)(3)(B), Fields and Shaw made it clear to Carol Laflamme that her daughter was no longer welcome at NHV after her discharge from IOL because of her mental disability.  That New Horizons did not evict Laflamme or physically bar her from entering her apartment is of no consequence, because the FHA does not require so high a showing.  *See, e.g.*, 24 C.F.R. § 100.70 (enumerating other types of prohibited rental conduct).[4]

In each of these ways, Defendants violated the FHA as to Laflamme.  With this direct evidence of discrimination, she has established that the Defendants' housing policies are unlawful on their face.  *See Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985) (finding the *McDonnell Douglas* burden-shifting framework "inapplicable where the plaintiff presents direct evidence of discrimination," and holding that the direct evidence established that the challenged policy was "discriminatory on its face").

_____

[4] Laflamme also alleges that Defendants violated the FHA by making discriminatory statements in furtherance of their application of the independent-living requirement. Because this is not a case in which liability is premised on statements alone, this allegation is captured by Laflamme's other claims directed at how Defendants effectuated their housing policies.  Thus, discriminatory statements made by Defendants regarding Laflamme's eligibility for NHV tenancy need not be assessed as a separate basis for liability under § 42 U.S.C. § 3604(c) and 24 C.F.R. § 100.75.

23

**C.      New Horizons's Claimed Defenses**

With Laflamme having made out a *prima facie* case of discrimination through direct, undisputed evidence, Defendants offer a number of justifications for their application of their policies to Laflamme.  None holds water.

   *1.      Direct-Threat Exception*

First, Defendants invoke the direct-threat exception.  They claim that when Laflamme was discharged from IOL, her reported depression and suicidal ideation made her dangerous to herself and her roommate.  The FHA, regulations, and legislative history, however, make clear that this exception has a very narrow reach.  There is no evidence in the record supporting a conclusion that Laflamme was dangerous to her roommate other than the "[g]eneralized assumption[s], subjective fears, and speculation" that Congress warned against as insufficient and based on stereotyping.  Defendants also offer no basis on which to extend this exception to permit denial of housing to an individual who is a threat to herself, in light of the statute's clear language referencing the "health or safety of *other* individuals."  42 U.S.C. § 3604(f)(9) (emphasis added).

On the eve of summary judgment, Defendants supplemented their earlier discovery responses to add that they considered Laflamme to be a threat insofar as "emergency invites rescue, and [her] frequent calls for ambulance assistance had the potential to place others in the New Horizons community at risk for emergency providers rushing to [her] apartment."  (Defs.' April 28, 2008 Resp., Ex. B to Pl.'s Mot. Strike [Doc. # 88] at 3.)  This eleventh-hour change in positions led Laflamme to move to strike this late disclosure.  In denying that motion at oral argument, the Court observed that such late disclosure could support an inference that Defendants relied on the direct-threat exception as a cover-up for

24

unlawful discrimination.  The Court need not reach that issue in the context of this motion for summary judgment, however, because, Defendants' *post hoc* rationalizations notwithstanding, there is no record evidence that they had a valid basis for invoking § 3604(f)(9) at the time they made the decision to make Laflamme's apartment unavailable to her in November 2004.

Relatedly, Defendants assert that they have a special position with respect to the FHA in that they lease shared rental housing.  Because the tenants live in such close quarters, Defendants argue, they should enjoy heightened discretion to further the independent-living needs of the apartment community so as to ensure that one tenant's residency does not adversely affect her roommate's use and enjoyment of her living space.  But this is not an adequate defense both because the Defendants cannot excuse their own discrimination by asserting the third-party rights of another tenant and because concerns over tenants' use and enjoyment are already addressed by state landlord-tenant law.  *See* Conn. Gen. Stat. tit. 47a.

2.     *State Authorizing Statutes*

Defendants also seek to justify their policies by referring to statutory schemes crafted by other state legislatures to promote housing opportunities for the physically disabled.  *See, e.g.*, 22 Va. Admin. Code § 40-71-150; Utah Admin. Code R432-270; Okla. Admin. Code § 310:663-3-5(a).  Defendants' essential argument on this point is that New Horizons policies must be lawful because other facilities in other states, sometimes directly pursuant to state authorization, have similar independent-living requirements.

The statues and cases Defendants cite in support of this argument are not on point.  Unlike in other states, the Connecticut enabling legislation did not establish NHV as an assisted-living facility, and so whatever level-of-care distinctions are made in such facilities

in other states, they are not relevant to the issues in this case. The approach taken by the General Assembly with respect to New Horizons is different than other states', and the status of those facilities and implementing statutes under the FHA is not before the Court in any event. Defendants' repeated references to NHV as a care facility are of no moment, because elsewhere the record makes clear that, however characterized, NHV does not provide treatment, medical care, or supervision to its residents.

The Court can only rule on the facts in the case before it. Whether or not NHV's policies would be permissible under the laws of other states has no bearing on the question of whether Defendants violated the FHA by discriminating against Laflamme on the basis of her disability.

### 3.   Lack of Discriminatory Animus

Defendants further justify their policies by contending that they did not act with any discriminatory animus toward Laflamme. This position misapprehends the nature of direct discrimination: "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). So long as Defendants admit that they applied their policies to Laflamme, they cannot avoid liability for disability discrimination by claiming benevolence.

### D.   Conclusion

Defendants offer their most compelling justification for why the NHV policies are not discriminatory in their opposition brief, arguing:

> [T]he meaning and purpose of the FHA evidences an intent to promote the ability of disabled individuals to manage and direct their own care, [which is] precisely what New Horizons[] has done throughout its interactions with

> Ms. Laflamme and other residents.  Far from violating the FHA, the allegedly
> discriminatory actions in fact further its purpose.

(Defs.' Opp'n at 19.)  This point has initial appeal for the simple reason that it is difficult to imagine the FHA as an obstacle to severely disabled persons pursuing appropriate and available housing opportunities.  The complication in this case is that New Horizons is no typical private landlord, but is, by its very nature, an organization serving the severely physically disabled.  Shaw protests that construing the FHA to prohibit its tenant-selection practices will necessitate a fundamental change in New Horizons's practices drafted with the wishes of the disabled community in mind.  Insofar as these practices violate federal fair-housing laws, he is correct.

There is, of course, no "commercial viability" exception in the FHA, nor is there one for housing providers whose concern and purpose is providing housing opportunities for disabled people as a whole.  A discriminatory housing practice is still unlawful even if made with good intentions if it denies housing to individuals with disabilities based on their disabilities.  In her moving papers, Laflamme captures the essence of the bottom line in this case: "Defendants can only prevail if the Court concludes that landlords, by virtue of providing housing to persons with severe physical disabilities, may ignore the requirements of the FHA.  No such exemption exists and therefore plaintiff is entitled to summary judgment."  (Laflamme's Reply at 1.)  The Court agrees.

This conclusion that Defendants violated the FHA need not spell the end for NHV. New Horizons can continue to make housing determinations based on the best interests of the community, so long as in making these determinations it does not violate the fair-housing rights of individuals.  What the FHA prohibits is denying housing opportunities to

individuals based on an impermissible criterion, *i.e.*, disability.  The undisputed evidence in this case shows that Defendants violated the FHA in applying their housing practices to Laflamme.  Because Defendants have not proved the applicability of any recognized exception in the FHA, Laflamme is entitled to judgment as a matter of law on her claims. The Court therefore grants Laflamme's motion for summary judgment and denies Defendants' motion.

IV.    **Motion to Dismiss OPA**

In addition to moving for summary judgment, Defendants have moved to dismiss OPA for lack of associational standing according to *Hunt v. Washington State Apple Commission*, 432 U.S. 333 (1977).  Defendants contend that OPA lacks standing for several reasons: its litigation strategy is determined by its executive director, not its advisory board; its represented constituents do not meaningfully participate in the organization; its constituents do not have a commonality of interests; it does not have a personal stake in litigation; it has no statutory grant of standing; and it is an inadequate representative of Connecticut's disabled community because its constituents have conflicting needs.

A.    **Relevant Background**

OPA is a protection-and-advocacy ("P&A") agency, operating pursuant to a collection of federal and state statutory mandates, most notably the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 15001–15044, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801–10827, the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e, and the state legislation establishing OPA, Public Act No. 77-589.  The agency's leadership is appointed by the governor, it has an advisory board which participates in public forums and focus groups, and

its constituency includes all individuals within Connecticut who are disabled.  By statute, OPA constituents (or family members of disabled individuals) comprise sixty percent of OPA's advisory council, and this body advises the organization on policies, priorities, and strategy. OPA pursued this case along with Laflamme based on reports that constituents had been turned away from NHV based on the extent of their disabilities.  In seeking declaratory and injunctive relief, OPA sought to ensure that constituents applying to NHV were treated in accordance with the fair-housing obligations imposed by federal law.

      **B.**    **Discussion**

*Warth v. Seldin* established that a representative association may meet the constitutional requirements of standing under Article III if "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action" and if "the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable."  422 U.S. 490, 511 (1975).  In *Hunt*, the Court confirmed that

> an association has standing to bring suit on behalf of its members when:
> (a) its members would otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane to the organization's purpose;
> and (c) neither the claim asserted nor the relief requested requires the
> participation of individual members in the lawsuit.

432 U.S. at 343.  The Court finds that OPA has made a showing that it satisfies these three elements.

First, OPA's constituents would have standing to challenge discriminatory policies at NHV in their own right.  As the Court previously ruled, NHV's use of medical-record releases which exceed the scope of inquiry permitted under the FHA has harmed OPA's constituents by "requir[ing] disclosure of intimate, private details [which] cannot be

remedied." 514 F. Supp. 2d at 257.  The elements of Article III standing thus are met: OPA's constituents have been injured by NHV policies, which injuries would be redressed by a favorable decision invalidating NHV's discriminatory admissions regime.  In a similar context concerning the relationship of a P&A agency (the "OAC") and the individuals it represents, the Ninth Circuit, rejecting an argument Defendants also offer here, reasoned:

> Put in starkest terms, [defendant's] membership argument is that because "individuals with mental illness [do not] actually control OAC's activities and finances," OAC cannot claim standing to represent their interests.  In constitutional terms, the essence of [defendant's] position is that without a direct membership linkage to incapacitated defendants, OAC cannot rely on injuries to those mentally ill defendants to meet the injury in fact requirement and establish the personal stake in the outcome of the litigation that the Constitution demands.

> We think [defendant's] membership argument is overly formalistic.  Given OAC's statutory mission and focus under [federal law], its constituents—in this case, the mentally incapacitated defendants—are the functional equivalent of members for purposes of associational standing.  In so holding, we agree with the only other circuit to have addressed the question. *See Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir.1999).

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003).  For the same reasons, the Court finds that OPA has satisfied the first *Hunt* element.

Second, the interests OPA seeks to protect through this litigation are germane to its purpose as a representative organization.  As a P&A agency, OPA's federal mandate is to

> (A) protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes; and (B) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.

42 U.S.C. § 10801(b)(2).  Through its mission statement, OPA confirms that it seeks "to advance the cause of equal rights for persons with disabilities and their families" by, among

other things, "exposing instances and patterns of discrimination and abuse" and "seeking individual and systemic remediation." (OPA's Opp'n Mot. Dismiss [Doc. # 100] at 39.) By the Second Circuit's conception, "the requirement of germaneness is undemanding; mere pertinence between litigation subject and organizational purpose is sufficient." *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 148 (2d Cir. 2006) (quotation marks omitted). The Court cannot see how exposing and seeking injunctive relief regarding discriminatory practices at NHV fail to fall squarely within OPA's organizational purpose.

Third, OPA's claims and relief sought in this litigation do not require the direct participation of its constituents. Unlike the first two *Hunt* requirements, this is merely a prudential consideration, not a constitutional one. *United Food & Com. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996). In cases such as this, "where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004). The only individualized relief sought is with respect to Laflamme, not OPA and its constituents. That OPA's constituents might have conflicting interests on some points does not render them indispensable to this case, for as the D.C. Circuit has noted, "the mere fact of conflicting interests among members of an association does not of itself defeat the association's standing to urge the interests of some members in litigation, even though success may harm the legal interests of other members." *Nat'l Mar. Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1223, 1234 (D.C. Cir. 1987).

This conclusion that OPA has satisfied the prerequisites for organizational standing is consistent with the many other decisions finding that P&A agencies meet the three *Hunt*

31

elements.  *See, e.g.*, *Disability Rights Wisconsin, Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 803–804 (7th Cir. 2008) (recognizing that "[n]obody denies that [the P&A agency] has a role to play as an advocate on behalf of the disabled," but dismissing on standing grounds for failure to "identif[y] any member with standing to sue"); *Oregon Advocacy Center*, 322 F.3d at 1116 (concluding that advocacy group meets *Hunt*'s first and third requirements because its disabled constituents possess sufficient indicia of membership and because Congress authorized P&A organizations to sue on behalf of injured constituents); *Doe v. Stincer*, 175 F.3d 879, 886–888 (11th Cir. 1999) (finding state P&A agency "to be analogous to the Apple Advertising Commission in *Hunt*" but remanding for failure to show that its members had standing).

Although Defendants refer to cases that have denied standing to P&A agencies, these opinions are either unpersuasive, *see, e.g.*, *Missouri Protection & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 809–810 (8th Cir. 2007) (rejecting P&A agency's basis for standing on the grounds that the constituents' have an insufficiently close relationship to the organization and that the "inquiry urged by" the agency in the litigation "is too abstract"), or distinguishable on their facts, *see, e.g.*, *Ass'n for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Center Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (denying associational standing on membership grounds to advocacy group "because most of its 'clients'—handicapped and disabled people—are unable to participate in and guide the organization's efforts").  The greater weight of authority, particularly within this circuit, establishes that organizations like OPA routinely are found to fit within the requirements for associational standing under *Hunt.  See, e.g.*, *Bernstein v. Pataki*, 233 F. App'x 21, 25 (2d Cir. 2007) (summary order) (" In the light of the statutory mandate granted to the Mental

32

Hygiene Legal Service, we conclude that [the agency, through its director] may also adequately litigate the legal questions at issue in this action."); *Disability Advocates, Inc. v. Paterson*, No. 03-3209, 2009 WL 414682, at *14–*15 (E.D.N.Y. Feb. 19, 2009) (rejecting defendants' position that disability-rights agency lacks associational standing); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 307 (E.D.N.Y. 2008) (concluding, "in light of their statutory mandates," that P&A agencies "have associational standing to pursue claims on behalf of their constituents in this action").

Defendants' remaining arguments do not fit neatly within the well-recognized *Hunt* framework, and in essence seek to add additional requirements for associational standing not imposed by case law. Defendants seek to discredit OPA as a worthy representative, for example, by referencing its executive director's status as a political appointee, by stressing how success for OPA in this case will benefit some constituents but harm others, and by emphasizing how OPA has not itself been harmed. None of these concerns bear on the determination of whether OPA has standing to bring its claims in this case. Defendants' extreme arguments about the impending demise of NHV should OPA prevail are relevant (if at all) to the ultimate merits of the case, not the question of OPA's standing.

### C.    Conclusion

Accordingly, the Court concludes that OPA has adequately demonstrated that it has associational standing to assert its claims against NHV. Defendants' motion to dismiss OPA is denied.

## V.    Motion to Compel Compliance

As a final matter, having denied Defendants' motion to dismiss OPA, the Court must consider OPA's motion to compel compliance with the earlier preliminary-injunction ruling.

33

OPA contends that New Horizons continues to make overly broad inquiries regarding the nature of applicants' disabilities, in violation of the FHA, HUD regulations, and an order of this Court directing New Horizons to redraft their application and release forms. *See* 514 F. Supp. 2d at 257. Specifically, OPA references the revised NHV forms and argues that

> in effect the only change that has taken place as a result of the revised forms is that now defendants seek information from a period of time that dates two years prior to the date of application to NHV rather than five years. Defendants still require broad releases of information from applicants' primary care physicians, psychologists, psychiatrists or counselors, and social workers. Applicants may also be required to undergo a physical examination if they cannot provide sufficient records. Furthermore, Defendants continue to assert, in utter disregard of the Court's Ruling, that "an individualized medical needs assessment must be performed on each applicant for tenancy at New Horizons Village."

(OPA's Mem. Supp. Mot. Compel [Doc. # 78-2] at 2–3 (citations omitted).)

Defendants respond by restating various arguments offered in connection with the summary-judgment motions, including: "The criteria for admissions to the program are designed to fulfill the mission and statutory purpose of New Horizons"; "New Horizons' guidelines for residency stem from a combination of its own goal of providing a community in which residents can manage and direct their own care while recognizing the level and adequacy of care available given its resources and purpose"; "When considering any application for residency, New Horizons attempts to determine the level of care that the applicant will need on a daily basis"; "New Horizons asks *all* of its applicants about their history of managing their own care and ability and their desire to live, direct, and manage their own care in this kind of setting"; and "[New Horizons] must make an objective inquiry of each applicant to assess the level of 'fit' and priority at the time of application." (Defs.'

34

Opp'n Mot. Compel [Doc. # 96] at 3–5.)

It is apparent that OPA and New Horizons continue to disagree over how the FHA governs the application process for tenancy at NHV.  Neither OPA nor the Defendants have moved for summary judgment as to OPA's claims, however, and so this motion to compel compliance is little more than a second round of briefing regarding OPA's motion for preliminary injunctive relief.  The Court already ruled on that request, holding NHV's application and release forms to be overly broad.  Specifically, as already quoted above, the Court concluded:

> The Court agrees that defendants' "Release of Background Information Form" and "Release of Medical Information Form" are too broad as currently written to come under the narrow exceptions to § 100.202(c).  [New Horizons] would be permitted under the HUD regulations to require the disclosure of records which would (a) verify the nature of an applicant's severe physical disability and therefore his or her eligibility, and (b) substantiate whether the applicant "would constitute a direct threat to the health or safety of other[s]" at NHV.  *See* § 100.202(c)(2), (d).  But [the] forms go too far in mandating that applicants "authorize full disclosure of any and all [background information] records" and "authorize the release of [medical] information [concerning] any past or present diagnoses, any surgical operation reports, any psychological and psychiatric reports, current health status summaries and medical charts, and a current history and physical examination."

514 F. Supp. 2d at 257.  Thus, the Court enjoined the use of the NHV forms on the ground that "they require confidential personal and medical information beyond what is necessary to determine whether a person meets the requirements of tenancy at NHV, and with insufficient regard as to the requirements of § 100.202(c)," and ordered Defendants to narrow their forms "to appropriately address the application processing needs of NHV" and to comply with the FHA and HUD regulations.  *Id.*  Lest there be any doubt about the effect of this previous ruling, the Court grants OPA's motion and orders Defendants to comply

with the terms of this injunction.

**VI.     Conclusion**

Accordingly, Plaintiff Denise Laflamme's Motion for Summary Judgment [Doc. # 83] is granted.  Defendants' Motion for Summary Judgment as to Plaintiff Denise Laflamme [Doc. # 84] is denied.  Defendants' Motion to Dismiss for Lack of Standing [Doc. # 81] is denied.  Plaintiff OPA's Motion to Compel Compliance [Doc. # 78] is granted, and Defendants are hereby ordered to comply with the terms of the preliminary injunction.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of March, 2009.